**2013-1596**
**(Reexamination No. 95/001,070)**

# United States Court of Appeals
# for the Federal Circuit

CROSS ATLANTIC CAPITAL PARTNERS, INC.,

*Appellant,*

*v.*

FACEBOOK, INC.,

*Appellee.*

*Appeal from the United States Patent and Trademark Office,*
*Patent Trial and Appeal Board in Reexamination No. 95/001,070.*

## BRIEF OF APPELLEE

HEIDI L. KEEFE
MARK R. WEINSTEIN
COOLEY LLP
Five Palo Alto Square
3000 El Camino Real
Palo Alto, CA 94306
Tel: (650) 843-5000
Fax: (650) 849-7400
hkeefe@cooley.com
mweinstein@cooley.com

MICHAEL G. RHODES
COOLEY LLP
4401 Eastgate Mall
San Diego, CA 92121
Tel: (858) 550-6017
Fax: (858) 550-6420
rhodesmg@cooley.com

*Counsel for Appellant FACEBOOK, Inc.*

JANUARY 13, 2014

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellee Facebook, Inc. certifies the following:

1.     The full name of every party or amicus represented by me is:

        Facebook, Inc.

2.     The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

        The party named in the caption, Facebook, Inc., is the real party in interest.

3.     All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

        There are no such corporations or companies.

4.     The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

| COOLEY LLP | BLAKELY SOKOLOFF TAYLOR & ZAFMAN LLP |
|---|---|
| Michael G. Rhodes | Dan De Vos |
| Heidi L. Keefe | David Richardson* |
| Mark R. Weinstein | *No longer with designated firm |

Dated: January 13, 2014

        */s/ Heidi L. Keefe*
        Heidi L. Keefe
        Cooley LLP

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ..................................................................i

TABLE OF AUTHORITIES ...................................................................iv

STATEMENT OF RELATED CASES .....................................................vi

I.     STATEMENT OF THE ISSUES ..................................................1

II.    STATEMENT OF FACTS ...........................................................2

III.   STANDARD OF REVIEW ..........................................................9

IV.    SUMMARY OF ARGUMENT.....................................................9

V.     ARGUMENT................................................................................12

   A.   The Board Properly Rejected XACP's Untimely Attempt to
        Antedate Certain Prior Art References ...............................12

      1.   The Board Did Not Abuse its Discretion in Finding
           XACP's Priority Date Arguments Were Untimely ................13

      2.   Substantial Evidence Supported the Board's Decision
           that the Challenged Claims Were Not Entitled to the
           Benefit of the '988 Application Filing Date ..........................19

      3.   Substantial Evidence Supported the Board's Rejection of
           XACP's Belated Conception and Reduction to Practice
           Arguments...............................................................................22

      4.   Substantial Evidence Supported the Board's Rejection of
           the Patent Owner's Conception Arguments...........................23

      5.   Substantial Evidence Supported the Board's Rejection of
           the Patent Owner's Reduction to Practice Arguments ...........31

   B.   Substantial Evidence Supported the Board's Obviousness
        Rejections ...........................................................................33

      1.   The Board Provided More than Sufficient Reasoning to
           Combine Each of the References.............................................38

   C.   The Board's Rejection Based on Hill (Yahoo!) and Tatham
        Was Supported by Substantial Evidence...........................40

# Table of Contents
## (continued)

**Page**

1.   The Board's Rejection Based on Miller and Liu Was Supported by Substantial Evidence ........................................46

2.   The Board's Rejection Based on Tatham, Herz and Liu Was Supported by Substantial Evidence ................................49

VI.   SUBSTANTIAL EVIDENCE SUPPORTED THE BOARD'S REJECTIONS BASED ON ROSEMAN AND SARIN ............................51

A.   The Board's Anticipation Rejection Based on Roseman Was Supported by Substantial Evidence....................................52

B.   The Board's Anticipation Rejection Based on Sarin Was Supported by Substantial Evidence....................................57

C.   The Board's Obviousness Rejection Based on Sarin and Hill Was Supported by Substantial Evidence...........................59

VII.   CONCLUSION...........................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Dow Jones & Co. v. Ablaise Ltd.*,
    606 F.3d 1338 (Fed. Cir. 2010) ........................................................................38

*Ex parte Borden*, No. 2008-004312,
    93 U.S.P.Q.2d 1473, 2010 WL 191083 (B.P.A.I. 2010) ..............................13, 16

*Fitzgerald v. Arbib*,
    268 F.2d 763 (C.C.P.A. 1959) .........................................................................33

*In re Applied Materials, Inc.*,
    692 F.3d 1289 (Fed. Cir. 2012) ..............................................................9, 34, 39

*In re Gleave*,
    560 F.3d 1331 (Fed. Cir. 2009) ....................................................................9, 52

*In re Mulder*,
    716 F.2d 1542 (Fed. Cir. 1983) .......................................................................33

*In re NTP, Inc.*,
    654 F.3d 1279 (Fed. Cir. 2011) .......................................................................24

*Muniauction, Inc. v. Thomson Corp.*,
    532 F.3d 1318 (Fed. Cir. 2008) .......................................................10, 38, 39, 40

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
    521 F.3d 1351 (Fed. Cir. 2008) .......................................................................45

*PowerOasis, Inc. v. T-Mobile USA, Inc.*,
    522 F.3d 1299 (Fed. Cir. 2008) ..................................................................14, 16

*Sanofi-Aventis v. Pfizer Inc.*,
    733 F.3d 1364 (Fed. Cir. 2013) ....................................................................9, 24

*Scharmann v. Kassel*,
    179 F.2d 991 (C.C.P.A. 1950) .........................................................................32

*Singh v. Brake*,
    317 F.3d 1334 (Fed. Cir. 2003) ....................................................................9, 13

iv

*Slip Track Sys., Inc. v. Metal-Lite, Inc*.
    304 F.3d 1256 (Fed. Cir. 2002) ........................................................23, 24, 26, 28

*Soverain Software LLC v. Newegg Inc*.,
    705 F.3d 1333 (Fed. Cir. 2013) ............................................................10, 33, 37

*W. Union Co. v. MoneyGram Payment Sys., Inc.*,
    626 F.3d 1361 (Fed. Cir. 2010) ..................................................................10, 38

## STATUTES

35 U.S.C. § 102(b) ....................................................................................................2

35 U.S.C. § 102(e) ................................................................................................2, 18

35 U.S.C. § 103(a) ....................................................................................................1

## OTHER AUTHORITIES

37 C.F.R. § 1.131 .........................................................................................19, 24, 32

37 C.F.R. § 41.77(b)(1).............................................................................................7

## STATEMENT OF RELATED CASES

In accordance with Federal Circuit Rule 47.5, counsel for Appellee

Facebook, Inc. states:

1.  Appellee is unaware of any other appeals or petitions taken in this
    reexamination proceeding in the Patent and Trademark Office before this
    Court.

2.  There is, however, another matter pending in another court and will be
    directly affected by this Court's decision in the pending appeal:

    •   *Cross Atlantic Capital Partners, Inc. v. Facebook, Inc.*,
        Case No. 2:07-cv-02768-JP (E.D. Pa.)

## I.    STATEMENT OF THE ISSUES

1.    More than three years into this reexamination, after a first appeal and remand by the Board, patent owner Cross Atlantic Capital Partners, Inc. ("XACP") for the first time argued that the claims of U.S. Patent No. 6,519,629 ("'629 patent") are entitled to the benefit of the filing date of U.S. Patent App. Ser. No. 09/264,988 ("'988 application"), filed on September 15, 1998.  The Board rejected this argument based on two rationale, presenting the following issues:

a.    Did the Board abuse its discretion in finding that XACP waived its priority date argument by waiting more than three years to present it, despite ample opportunity and motivation to do so earlier?

If no abuse of discretion is found and this determination is upheld, no other issues need to be resolved with respect to XACP's priority date arguments. Otherwise, the Court must address the following additional issue:

b.    Did substantial evidence support the Board's alternative finding that XACP failed to show entitlement to the '988 application filing date, and failed to show entitlement to an earlier date of conception and reduction to practice?

2.    The claims of the '629 patent recite techniques for creating an on-line community accessible over a computer network such as the Internet.  The Board rejected claims 1-32 and 76-146 (all pending claims) as obvious under 35 U.S.C. § 103(a) based on its factual determination that the alleged invention recited

combinations of known computer and networking techniques fully disclosed by the prior art.  Was the Board's decision supported by substantial evidence?

3.    The Board also found claims 1-32 anticipated by U.S. Patent No. 6,608,636 to Robert Roseman under 35 U.S.C. § 102(e).  Was this rejection supported by substantial evidence?

4.    The Board also found claims 1, 2, 4-7, 9, 10, 12-15, 17, 18, 20-23, 25, 26, and 28-31 anticipated by Sunil Sarin et al., *Software for Interactive On-Line Conferences* (1984) under 35 U.S.C. § 102(b).  Was this rejection supported by substantial evidence?

5.    The Board also found claims 3, 11, 19 and 27 obvious over the Sarin reference in view of Brad Hill, *Yahoo! for Dummies* (1999).  Was this rejection supported by substantial evidence?

## II.    STATEMENT OF FACTS

The '629 patent, entitled "System for Creating a Community for Users With Common Interests to Interact In," issued on February 11, 2003 from an application filed on October 2, 2001.  (JA28.)  The application was a divisional of U.S. Patent Application No. 09/513,844 ("CIP '844 application") filed on February 25, 2000, which in turn was a continuation-in-part of U.S. Patent App. Ser. No. 09/264,988 ("'988 application"), filed on September 15, 1998.  (JA28, JA3580.)  The '988 application does not claim priority to any previous application.  (JA3580).

The original prosecution of the '629 patent was uneventful and indicative of an application that received very little prior art scrutiny. A first Office Action issued on May 18, 2002 allowing all claims in the application. (JA913.) No claims were rejected during prosecution, and no prior art was discussed during the original prosecution. (*Id.*)

The '629 patent purports to describe techniques for creating on-line communities that can be accessed by users over a computer network, such as the Internet. (JA45, 4:24-46, JA46,5:28-31.) Although the specification spans 30 columns and includes 11 figures, the claims are more narrowly directed toward the process by which a user interacts with a server ("central controller") to create an on-line "community." The specification provides the following summary of this process:

> For purposes of explaining the present invention, a specific embodiment will be described. This embodiment is examplary only, and is not intended to limit the scope of the invention. A creator accesses a central controller over a network to create a community using a community creating module. In this example, the title of the community is "The William Henry Harrison Historical Preservation Society." The community creating module permits the creator to create a community, and designate applications and content presented in the community by a user interface. The applications in the present example include a chat application object for users to interact with each other in chat format, a schedule application object for scheduling appointments for the events, a pledge application object for pledging a donation, a photo album application object for viewing photos related to William Henry Harrison, and other application objects. Content in the present

> example includes information about upcoming fund raising events and meetings for the society, information about current funds collected, biographical information about William Henry Harrison, and other information.

(JA45, 4:24-46.)

A community creator can also designate other users who will have access to the community by, for example, specifying the e-mail addresses of other users who will be invited to join the community. (*Id.*, 4:48-54.) The invited users can then receive an invitation, which in one embodiment can include transmitting an executable "invitation application" that facilitates the invitee's access to the community. (JA51, 15:28-38.)

The '629 patent as originally issued contained 32 claims, with four independent claims (*i.e.* claims 1, 9, 17, 25). These claims recite similar limitations focusing on a particular process for creating an on-line community. Originally-issued claim 1, prior to its amendment in reexamination, recited:

> 1.  A method for creating a community for users with common interests to interact in, the method comprising the steps of:
>
> receiving a creation transmission from a registered user, the creation transmission indicating that the registered user desires to create a community;
>
> receiving community identification information from the registered user;
>
> receiving a selection of at least one application object from the registered user;

creating a community based on the community identification information and the at least one application object;

receiving at least one communications address designated by the registered user, the at least one communications address corresponding to a user to receive a created community; and

transmitting the created community based in part on the at least one communications address.

(JA58-59, 30:65-31:17.)

The claims of the '629 patent seek to lay claim to using a computer to perform a familiar social process that occurs every day. For example, in everyday life a known member of a group (the "registered user") can decide to create a meeting or special interest gathering (a "community") around a common interest, topic or event. The creator can name this community and provide a description and agenda ("community identification information"), and can designate tools and equipment for use during the meeting ("application objects"). The creator can also create a list of other people ("communications addresses"), who will be invited to join the community. Not surprisingly, the applicants for the '629 patent were not the first to use a computer to perform this everyday social process.

On July 21, 2008, Facebook filed its request for *inter partes* reexamination identifying several prior art references that disclosed this concept. (JA61.) The prior art references spanned a broad range of dates and technologies, including text conferencing systems from the 1980s (JA85-88 (Sarin)), teleconferencing systems from the early 1990s (JA78-79 (Roseman)), and web-based collaborative systems of the mid- to late-1990s (JA73-75 (Tatham), JA79-80 (Hill)).

For example, U.S. Patent No. 6,608,636 to Robert Roseman ("Roseman") entitled "Server Based Virtual Conferencing," discloses a system for creating a virtual on-line video or teleconference. (JA3484.) Roseman build atop the analogy of scheduling a meeting by disclosing a system for creating a "virtual" conference room for users to collaborate over a network. The meeting creator specifies identification information for the conference room, selects the virtual "tools" and "equipment" that will be in the conference room (such as a "notepad" or "flip chart" applications), and designates the other users that will be invited. (JA3509, 3:21-50, JA3512, 10:9-12.) Each invitee may receive an "invitation card" through their computer that, when executed, provides information about the meeting. (JA45, 4:5-27, JA46, 5:58-63.) Roseman and the other references of record in this appeal disclose the community-creation process of the '629 patent.

The Examiner granted Facebook's reexamination request and, on October 16, 2008, issued a first Office action rejecting all claims based on the prior art cited in the reexamination request. (JA910.) XACP responded by asserting that certain limitations in the independent claims were not disclosed by the prior art. (JA1028-1065.) XACP did not dispute the prior art status of any of the references cited by the Examiner, and did not argue that any of the claims were entitled to the benefit of the filing date of any earlier application. (*Id.*)

On September 30, 2009, the Examiner issued an Action Closing Prosecution (ACP) confirming the claims over the prior art. (JA1483.) The Examiner rejected the vast majority of XACP's arguments but confirmed the claims based on the limitation relating to "transmitting" the community recited in the independent claims. (JA1512, ¶ 19.)

On June 28, 2011, the Board issued a decision reversing the Examiner and entering six new grounds of rejection covering all pending claims based on anticipation and obviousness. (JA2628, JA2644.) XACP responded by filing an Amendment and Request to Reopen Prosecution pursuant to 37 C.F.R. § 41.77(b)(1), seeking to amend its claims and add new claims 76-146. (JA2774.)[1] XACP sought to narrow its independent claims to require the transmission of a community including an "application object" with an "executable component." This requirement is reflected in the final limitation in claim 1 as amended:

> 1. (Amended) A method for creating a community for users with common interests to interact in, the method comprising the steps of:
>
> * * *
>
> receiving a selection of at least one application object from the registered user, <u>said at least one application object including an executable component</u>;
>
> * * *

---

[1] Claims 1-32 and 76-146 are the only pending claims. Claims 33-75 were added earlier in this reexamination but were canceled by the patent owner before the first appeal to the Board. (JA1511, ¶ 15; App. Br. at 11.)

> transmitting the created community, <u>including the at least one application object</u>, based in part on the at least one communications address.

(JA2775 (underlining showing amendments).)

Facebook responded by arguing that certain rejections entered by the Board should be maintained notwithstanding the amendments, and that additional rejections should be entered to account for the patent owner's amended and new claims. (JA2976.) Facebook's response explained that the subject matter of XACP's amendments – sending an "application object" with an "executable component" – was simply an attempt to lay claim over well-known technologies such as "Java" applets downloaded to a user's web browser over the Internet. (JA2985-86, JA2989-91.) The "transmitting" limitations, even as amended, provide neither a novel nor non-obvious distinction over the prior art of record.

The Examiner adopted Facebook's rejections, which were affirmed by the Board in its second decision dated February 5, 2013. (JA8.) XACP subsequently requested rehearing, which the Board denied on June 13, 2013. (JA1.) Claims 1-32 and 76-146 therefore stand rejected on the grounds affirmed by the Board. As explained in the sections that follow, XACP has identified no error in the Board's rejections and no basis to disturb them.

## III. STANDARD OF REVIEW

XACP first appeals the Board's decision to decline to consider its untimely argument that the '629 patent is entitled to the benefit of the filing date of the '988 application. (App. Br. at 16-19.) The Board's decision to decline to consider this argument is reviewed for abuse of discretion. *See Singh v. Brake*, 317 F.3d 1334, 1339-40 (Fed. Cir. 2003).

This Court reviews factual findings by the Board for substantial evidence. *See, e.g.*, *Sanofi-Aventis v. Pfizer Inc.*, 733 F.3d 1364, 1366 (Fed. Cir. 2013). Under this standard, "[t]he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *In re Applied Materials, Inc.*, 692 F.3d 1289, 1294 (Fed. Cir. 2012) (quotations and citation omitted).

The ultimate determination of obviousness is a question of law reviewed *de novo*, but any factual findings associated with an obviousness determination are reviewed for substantial evidence. *Id.* at 1294. Anticipation presents a question fact and, as such, the Board's anticipation determinations are reviewed for substantial evidence. *See In re Gleave*, 560 F.3d 1331, 1334-35 (Fed. Cir. 2009).

## IV. SUMMARY OF ARGUMENT

The '629 patent purports to describe techniques for creating an on-line community that can be accessed by users over a computer network such as the

Internet. It is undisputed that the creation of such an on-line community was neither novel nor non-obvious, and disclosed by the prior art of record in this reexamination. The only limitation relied upon by XACP to attempt to distinguish the prior art is a single requirement, added through amendment during this reexamination, of sending an executable application program to the user's computer along with the community. This additional requirement, however, was simply an attempt to lay claim over the well-known prior art technique of sending a "Java" applet to the user's web browser over the Internet.

The Board correctly concluded that the pending claims, as amended, simply arrange old elements in predictable and unremarkable ways. The obviousness rejections entered by the Examiner and affirmed by the Board were consistent with a growing line of recent decisions by this Court applying the *KSR* standard of obviousness in the Internet context. *See, e.g.*, *Soverain Software LLC v. Newegg Inc.*, 705 F.3d 1333, 1340-41 (Fed. Cir. 2013) (holding that claim limitations directed to well-known Internet features did not render claims non-obvious); *W. Union Co. v. MoneyGram Payment Sys., Inc.*, 626 F.3d 1361, 1370 (Fed. Cir. 2010) ("Based on the Supreme Court's reasoning in *KSR*, we have subsequently held that applying computer and internet technology to replace older electronics has been commonplace in recent years."); *Muniauction, Inc. v. Thomson Corp.*, 532 F.3d 1318, 1324 (Fed. Cir. 2008) (holding that limitations directed at use of

internet and conventional web browser technology did not render claims nonobvious over the prior art).

XACP previously presented a myriad of arguments attempting to distinguish the prior art, but all of these arguments were rejected by the Examiner and the Board and ultimately abandoned by XACP. Its sole remaining theory is that the prior art does not disclose or render obvious transmitting an executable application with an on-line community. But when XACP realized that that argument would also fail, it made a last-minute attempt to argue that prior art that had been part of this reexamination since day one was not, in fact, prior art. The Board held that XACP's belated priority date arguments, made more than three years into this reexamination, had been waived – and alternatively that they were meritless even if considered. XACP has failed to show that the Board's decisions constituted either an abuse of discretion or lacked substantial evidence.

XACP's focus on the priority date arguments is understandable because, as its appeal brief confirms, it has no legitimate basis to challenge the obviousness rejections affirmed by the Board. XACP's appeal brief gives lip service to the governing standard of review, but does not attempt to show that the Board's conclusions lacked substantial evidence in the record. XACP instead distorts the appellate record and the prior art references, and improperly seeks to reweigh the evidence anew. The Board correctly found that every limitation of every pending

claim was disclosed by the prior art references of record, and that a skilled artisan would have ample motivation to combine them.

The Board also entered rejections of the original claims (1-32) based on anticipation and obviousness, which are also based on factual findings reviewed deferentially for substantial evidence. The patent owner has made no showing that the Board erred with respect to any of those rejections, either.

## V.    ARGUMENT

### A.    The Board Properly Rejected XACP's Untimely Attempt to Antedate Certain Prior Art References

More than three years after the present reexamination was initiated, and in the middle of its second appeal to the Board, XACP for the first time attempted to demonstrate that the '629 patent was entitled to the benefit of the filing date of the '988 application filed on September 15, 1998. The Board relied on two rationales to reject this argument. First, the Board concluded that XACP waived its priority date arguments by failing to present them in a timely fashion. (A17-A18.) Second, the Board went on to find that XACP's priority date arguments, even if considered, would fail on their merits. (A18 ("Even assuming that Patent Owner's untimely presented arguments pertaining to priority are considered, however, we agree with Requester that Patent Owner has failed to demonstrate support for an earlier priority date…"); JA4 ("The Decision [of the PTAB] fully addressed Patent Owner's arguments with respect to the filing date of the '629 patent.").) As

explained below, the Board did not abuse its discretion in finding that XACP waived its priority date arguments, and substantial evidence supported its alternative conclusion that those arguments were without merit.

### 1. The Board Did Not Abuse its Discretion in Finding XACP's Priority Date Arguments Were Untimely

The Board's decision to decline to consider the patent owner's priority date arguments is reviewed for abuse of discretion. *See Singh*, 317 F.3d at 1339 ("We review the Board's application of its rules for an abuse of discretion."). As this Court has noted, "the Board does not abuse its discretion when it declines to consider untimely arguments." *Id.* at 1340 (citing *Credle v. Bond*, 25 F.3d 1566, 1572 n.14 (Fed. Cir. 1994)). The Board has held that "[p]roperly interpreted, the Rules do not require the Board to take up a belated argument that has not been addressed by the Examiner, absent a showing of good cause." *Ex parte Borden*, No. 2008-004312, 93 U.S.P.Q.2d 1473, 2010 WL 191083, at *5 (B.P.A.I. Jan. 7, 2010) (informative decision).

Here, the Board did not abuse its discretion in declining to consider the patent owner's belated priority date argument. The patent owner allowed the reexamination to proceed for more than three years, through an entire first appeal to and remand by the Board, and after a further determination by the Examiner, before ever asserting that the '629 patent was entitled to the September 15, 1998

13

filing date of the earlier '988 application.  (*See* JA3248-3251.)  The patent owner

had numerous opportunities and ample motivation to raise those arguments earlier.

The priority date of the '629 patent was front-and-center from the beginning

of the reexamination proceeding.  The original Request for *Inter Partes*

Reexamination filed by Facebook on July 21, 2008 specifically argued that "[a]ll

of the claims are only entitled to the February 25, 2000 filing date of the CIP '844

application, and not the earlier priority date of the '988 application."  (JA71-72.)

The Request raised this issue because certain prior art references, including the Hill

(Yahoo!) reference that is the subject of this appeal, was published in 1999.

(JA350.)  The Request explained that certain limitations recited in all claims were

supported only by new matter first appearing in the CIP '844 application.  (JAI71-

72)  The Request explained that "the burden is on the patent owner to come

forward with evidence to prove entitlement to the filing date of the '988

application."  (JA72 (citing *PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d

1299, 1305-06 (Fed. Cir. 2008)).)

On October 16, 2008, the Examiner issued an order initiating reexamination

of the '629 patent.  That order called out the priority date issue (JA913, ¶ 12(A)),

finding that "consideration of the Harvey patent's priority claim to the ['988

application] raises an SNQ as to claims 1-32 of the Harvey patent because it

changes the date by which art qualifies as prior art for the Harvey patent."  (JA915,

¶ 14.)  Two weeks later, the Examiner mailed an initial Office Action rejecting all claims based on the prior art cited in the Request – including the intervening 1999 Hill (Yahoo!) reference.  (JA923; JA927, ¶ 14; JA928, ¶ 19(C); JA947, ¶ 24.) Although the Office Action did not expressly discuss the priority date issue, the Examiner obviously did not afford the patent the 1998 date from the earlier '988 application because, if she had, she would not have entered rejections based on the 1999 Hill reference.

XACP could have responded to that Office Action by challenging the prior art status of Hill by arguing that the '629 patent is entitled to the filing date of the earlier '988 application.  But it did not.  XACP instead ignored the priority date issue, did not challenge the prior art status of any of the cited references (including Hill (Yahoo!)), and rested its response solely on the assertion that the prior art did not disclose certain claim limitations.  (JA1145, JA1174-79.)

The reexamination proceeded for three more years, through an entire first appeal to and remand by the Board, and through a further determination by the Examiner following the appeal and reopening of prosecution, before the patent owner ever suggested (a) that the '629 patent was entitled to the filing date of the earlier '988 application, or (b) that Hill (Yahoo!) did not qualify as prior art.  It was only when this reexamination was before the Board for the second time – after all of the patent owner's claims stood rejected and all of its arguments had failed –

that the patent owner made its last-minute attempt to assert that it was entitled to the earlier filing date.  (JA3203, JA3098.)

The Board has observed that "[i]t is in no way unfair to require applicants for patents, including Appellants to the Board, to present their best arguments in a timely fashion."  *Borden*, 93 U.S.P.Q.2d 1473, 2010 WL 191083, at \*5.  "Belated arguments, if addressed, impose costs on the Agency . . . which in turn impose costs on the public . . . ."  *Id.*  The Board did not abuse its discretion in determining that the patent owner should have raised the priority date issue much earlier than it did, for example, after the initial Office Action.[2]

XACP contends that its priority date arguments were timely because the specific combinations of references relied upon by the Board were first proposed after the patent owner submitted its Amendment reopening prosecution.  (App. Br. at 16-17.)  This argument overlooks the fact that, throughout this reexamination, the Examiner and the Board relied on intervening prior art references (such as Hill)

---

[2]  XACP suggests that it had no obligation to raise its priority date arguments because the Examiner did not make an express determination as to the priority date to which the '629 patent is entitled.  (App. Br. at 16-17.)  The Examiner was not required to make any finding as to the priority date, however, because the claims were presumptively not entitled to the filing date of the '988 application.  *See PowerOasis, Inc. v. T-Mobile USA, Inc.*, 522 F.3d 1299, 1305-06 (Fed. Cir. 2008) (holding that patent owner bore burden of showing that claim issuing from continuation-in-part application was entitled to filing date of earlier application).  It was therefore incumbent on XACP, in response to the initial Office Action, to demonstrate entitlement to the earlier filing date.  Because XACP made no such attempt, the Examiner had no obligation to issue an express ruling on this issue and was entitled to rely on the presumptive priority date of February 21, 2000.

that squarely placed the priority date at issue.  The fact that different combinations of prior art references were later applied in the reexamination, in response to amendments made by XACP, did not give XACP a basis to assert priority date arguments it could have presented much earlier.

XACP also argues that it was entitled to raise the priority date issue anew because the Examiner relied on additional pages from Hill after the reopening of prosecution following the Board's first decision.  (*See* App. Br. at 17-18.)  "The Yahoo reference relied on by the Board in Decision II," according to XACP, "was thus essentially a new reference against which XACP could not have asserted its priority date before it did so, i.e. in response to the Facebook Comments."  (*Id.*) This argument is, at best, disingenuous.  The additional portions of Hill submitted after the Board's first decision came from the very same *Yahoo! for Dummies* textbook that was cited in the original reexamination request.  (JA348-387, JA2887-2973.) These additional pages did not change the publication date of Hill or give XACP any excuse for failing to challenge the book's prior art status earlier, when XACP had the opportunity and clear incentive to do so.

XACP next asserts that it timely presented its priority date arguments because the Examiner also relied on the Miller and Liu prior art references following the first appeal to the Board.  But these references do not excuse XACP's to raise its priority date arguments earlier.  With respect to Miller, it has a

priority date under § 102(e) of September 21, 1999, the same year as Hill. Miller therefore raises the exact same priority date issues as the previously-cited Hill reference.[3] Had the patent owner timely challenged the prior art status of Hill, the resolution of that challenge would have also resolved the eligibility of Miller as prior art. Miller therefore did not give the patent owner an excuse for belatedly raising the exact same arguments it should have raised much earlier to address Hill.

With respect to Liu, the patent owner's filing date arguments were irrelevant because Liu issued from an application filed on May 22, 1998, before the filing date of the '988 application. (JA3454.) Liu therefore qualifies as prior art under 35 U.S.C. § 102(e) (pre-AIA) even if the patent owner could establish that the '629 patent was entitled to the September 15, 1998 filing date of the '988 application. The patent owner does not explain how the Examiner's citation to Liu or Miller provided any excuse for its failure to raise the priority date argument earlier.[4]

---

[3]  XACP does not claim surprise at the citation to Miller following the Board's first decision, nor could it. The Requester identified Miller on January 14, 2009 following the initial Office Action as invalidating prior art for new claims 33-76. (*See* JA1234, JA1236.) Although those proposed rejections were mooted by the patent owner's subsequent cancelation of new claims 33-76 before the first appeal to the Board, they nonetheless placed the patent owner on early notice of the relevance of the applicability and relevance of the Miller reference.

[4]  In fact, the only way the patent owner could attempt to avoid Liu was to try to "swear behind" it, which the patent owner attempted to do in reliance on an untimely Rule 131 Declaration. (JA3098). The patent owner's attempt to "swear behind" Liu, however, depended on the assumption that the alleged invention was constructively reduced to practice with the filing of the '988 application. (JA3107,

The patent owner's arguments were a belated attempt to make arguments it failed to make in response to the initial Office Action, and chose not to argue to the Board during its first appeal. A submission more than three years into this reexamination, raising priority date issues for the first time during its second trip to the Board, is improper and untimely. The Board was well within its discretion to deem those arguments waived.

> **2. Substantial Evidence Supported the Board's Decision that the Challenged Claims Were Not Entitled to the Benefit of the '988 Application Filing Date**

Even if the patent owner's priority date arguments were not waived, substantial evidence supported the Board's substantive rejection of them. The patent owner submitted an untimely declaration under 37 C.F.R. § 1.131 to assert that certain claims of the '629 patent are entitled to the September 15, 1998 filing date of the '988 application. (JA3107, ¶ 9 (citing JA3154-3157 (Exhibit M).) The '988 application, however, cannot support an earlier claim of priority because it does not disclose the claimed invention. As demonstrated below, several limitations recited in each independent claim of the '629 patent were first disclosed in the CIP '844 application filed on February 25, 2000.

The '988 application has nothing to do with the creation of a "community," the subject matter of every claim in the '629 patent. The application instead relates

---

¶ 9.) Because the patent owner waived this filing date argument, its attempt to "swear behind" Liu failed as a matter of law.

to distribution of software for an on-line gaming system, with no discussion about the creation, customization or transmission of a community. (JA3581.)  <u>The word "community," in fact, does not appear even once in the '988 application</u>.  The subsequent '844 CIP application, on the other hand, added an extensive new section (spanning six columns in the issued '629 patent), entitled "Creating a Community," that describes, for the first time, the process for creating a community recited in each independent claim.  (JA47-50, 7:25-13:5.)  The subsequent application also added a new section describing the creation of the invitation "application object" that is transmitted to invitees of the community (JA50-51, 13:8-16:63), a requirement of all claims as amended.  This material is essential to, and the basis for, every claim in the '629 patent.

The lack of support in the earlier '988 application is further illustrated by comparing it against specific claim limitations.  The first step of claim 1 recites "receiving a creation transmission . . . indicating that the registered user desires to create a community."  The patent owner attempts to support this limitation with twelve lines from the '988 application that describe nothing more than a registration process in which the user furnishes information necessary for game play, and can then access a "lobby" area.  (App. Br. at 19 (citing JA3599, ll. 12-21, JA3600, ll. 3-5).)  There is no disclosure of any further transmission from a

registered user, let alone a transmission indicating that it "desires to create community."  The '988 application simply does not support this limitation.

The second step of claim 1 recites "receiving community identification information from the registered user."  There is likewise no support for this element in the '988 application.  The patent owner cites the same twelve lines mentioned above, and claims that "[t]he selection of the above items satisfies" this limitation as well.  (App. Br. at 19-20.)  But these lines describe nothing more than the ability of the user to select which pre-existing chat room it wishes to enter.  Selecting a pre-existing chat room to enter has nothing to do with providing "community identification information" for a new, to-be-created community.  The '988 application discloses no mechanism to allow a user to create a new chat room, let alone provide a name or other identification for it.  The subsequent '844 CIP application, on the other hand, added a brand new description of receiving "community identification information" from a user (JA47-48, 7:61-8:14) such as "a community name, description, search tags, keywords, and topline key" (JA47, 7:61-64), and described how it was processed and validated during community creation process.  (JA48, 8:24-34.)  The earlier '988 application did not include any of this description pertaining to "community identification information."

Nor does the '988 application support the remaining steps of claim 1 relating to selecting at least one application object, creating a community "based on the

community identification information and the at least one application object," and then receiving communications addresses of users to whom the community will be transmitted. The passages cited by the patent owner relate to sending a game or application – not a community – to other users. (App. Br. at 20 (citing JA3600 ll. 9-11, JA 3602 ll. 6-8 & 11-12).) The creation and transmission of a community is not described anywhere in these passages.

Finally, as with its claim of prior invention discussed above, the patent owner does not contend that the following claims are entitled to the filing date of the '988 application: claims 5-8, 13-16, 21-24, 29-32, 77, 81, 84, 86, 88, 90, 93, 95, 98, 100, 102, 106, 108, 112, 115, 117, 119, 121, 124, 126, 131 and 137-145. (App. Br. at 19.) Because the patent owner did not address those 46 claims, there is no dispute that they are entitled to a filing date no earlier than February 25, 2000. For all of these reasons, therefore, substantial evidence supported the Board's rejection of the patent owner's untimely priority date arguments.

### 3. Substantial Evidence Supported the Board's Rejection of XACP's Belated Conception and Reduction to Practice Arguments

The patent owner next contends that the Board erred in rejecting the patent owner's contention that the claims of the '629 patent were entitled to an invention date prior to May 22, 1998, the filing date of the Liu reference. (App. Br. at 21-27.) Because the patent owner has failed to show that the '629 patent is entitled to

the filing date of the '988 application, this Court need not consider its conception and reduction to practice arguments at all. This is because the patent owner's claim of prior invention expressly depends on the assumption that the claimed invention was constructively reduced to practice with the filing of the '988 application on September 15, 1998. (App. Br. at 22.) Because the earlier '988 application does not disclose the claimed subject matter as explained above,[5] it does not support constructive reduction to practice. Accordingly, if this Court does not disturb the Board's finding that the '629 patent is not entitled to the filing date of the '988 application, the prior invention claim fails as a matter of law. In any event, as explained below, substantial evidence supported the Board's rejection of the patent owner's conception and reduction to practice arguments.

### 4.   Substantial Evidence Supported the Board's Rejection of the Patent Owner's Conception Arguments

This Court has made clear that conception must include all elements of the claimed invention. "Conception is the formulation of a definite and permanent idea of the complete and operative invention as it is hereafter to be applied in practice." *Slip Track Sys., Inc. v. Metal-Lite, Inc*., 304 F.3d 1256, 1262-63 (Fed. Cir. 2002). "Conception must include every feature or limitation of the claimed invention." *Id.* (emphasis added). "Inventor testimony alone is insufficient to

---

[5]   The patent owner makes no attempt to show diligence in reduction to practice between September 15, 1998 and February 25, 2000, the filing date of the subsequent '844 CIP application. (JA3104, ¶ 8.)

prove conception; <u>some form of corroboration must be shown</u>." *Id.* (emphasis added). The patent owner relies entirely on a declaration under 37 C.F.R. § 1.131 ("Rule 131 declaration"), that fails to establish conception of the alleged invention under these standards.

Factual findings relating to conception and reduction to practice are reviewed for substantial evidence. *See, e.g.*, *Sanofi-Aventis v. Pfizer Inc.*, 733 F.3d 1364, 1366 (Fed. Cir. 2013) (factual findings relating to conception and reduction to practice are reviewed for substantial evidence (citing *Dawson v. Dawson*, 710 F.3d 1347, 1353 (Fed. Cir. 2013)); *In re NTP, Inc.*, 654 F.3d 1279, 1292-93 (Fed. Cir. 2011) ("This court does not reweigh evidence on appeal, but rather determines whether substantial evidence supports the Board's fact findings."). The Board had more than substantial evidence to disregard the patent owner's arguments and find the declaration unreliable.

The declaration of the inventor, James Harvey, asserted that conception occurred "in the September-October 1997 time frame" (JA3100, ¶ 7(b)), an assertion that could not be reconciled with his prior testimony. On January 25, 2008, Mr. Harvey gave an oral deposition in a patent infringement case in which the patent owner is asserting the '629 patent against Facebook. A key purpose of that deposition was to ascertain the precise date Mr. Harvey believed was the date of conception for the '629 patent. Mr. Harvey was asked three times during that

deposition about the date of conception. (JA3216-3218 (Harvey Depo.), at 159:14-161:41.) Mr. Harvey identified "September 1998," when the '988 application was filed, and did not identify any earlier date. (*Id.* at 159:14-161:41, 160:4-8 ("A: So in my mind, that was all in place when he applied for the patent at Digital Addiction. Q: You mean the September 1998 application? A: Yes."), 160:19-161:2 (same).) When pressed to state whether conception occurred prior to September 1998, Mr. Harvey testified that "**I am not sure**," and then reiterated that it occurred "[n]o later than September 1998." (*Id.* at 161:10-21 (emphasis added).)

The patent owner asserts that there was no inconsistency in Mr. Harvey's testimony (App. Br. at 22-23), but this is inaccurate. Mr. Harvey was repeatedly asked but could not recall, in his January 2008 deposition, the point prior to "September 1998" when conception allegedly occurred. One would expect Mr. Harvey's memory to have faded in the nearly four years that passed between his oral deposition and the submission of his Rule 131 Declaration on December 11, 2011. But XACP would have the Board believe that the exact opposite occurred, that Mr. Harvey was able only now able to recall conception "in the September-October 1997 time frame" (JA3100, ¶ 7(b)) as alleged in his Rule 131 Declaration. The Board could properly have relied on this unexplained inconsistency as a basis to discredit XACP's claim that conception occurred prior to May 15, 1998.

But even more problematic to XACP's conception date argument was the failure to address the contribution of co-inventor Andrew Fregly,[6] who also provided sworn testimony in the litigation referenced above that fatally undermines Mr. Harvey's claimed date of conception.  Mr. Fregly testified that he did not join Mr. Harvey at the applicant company (iKimbo) until mid-October 1999, more than a year after the '988 application was filed.  (JA3224, 27:1-3.)  Mr. Fregly testified that the only feature in the iKimbo product at that time was a "chat function," and that upon joining the company, he "started developing a product to support online communities."  (JA3226:24-JA3227:3  (emphasis added).)    Mr. Fregly further explained: "I looked at our – after talking with our business people, both Jamey [Harvey] and Eric, basically came up with a technical solution to the business ideas they had."  (JA3227:17-21 (emphasis added).)

Mere "business ideas," what iKimbo had prior to Mr. Fregly's arrival in October 1999, are not what patent law requires for actual conception – the "definite and permanent idea of the complete and operative invention as it is hereafter to be applied in practice."  *Slip Track Sys., Inc.*, 304 F.3d at 1262-63. True conception could not have occurred until after Mr. Fregly, the co-inventor,

---

[6]   XACP's brief mistakenly refers to Mr. Fregly as "Andrew Fegly," repeating a typographical error on the face of the '629 patent.  The correctly spelling of his last name is "Fregly," not "Fegly."  (JA3222.)

joined iKimbo and development of the "technical solution" to Mr. Harvey's "business ideas" began.

That technical solution was the subject of the CIP '844 application that was filed on February 25, 2000. Mr. Fregly was added as an inventor on that application, reflecting his contribution to the conception of the invention. As Mr. Fregly testified in his deposition: "I considered myself an inventor as a person who determined how to take those business concepts and convert them into a technology solution." (JA3229:24-3230:3.) XACP offers no explanation as to why Mr. Fregly was added as an inventor on the subsequent CIP '844 application if he had no contribution to conception of the alleged invention.

That subsequent application added an enormous amount of new material including the entire section of the '629 specification entitled "Creating a Community" (JA47-50, 7:25-13:6) that describes steps recited in every claim of the '629 patent. That application also disclosed, again for the first time, an explanation about creation of an "application object" with an "executable component" that is transmitted to invitees of the community (*id.*, 13:8-16:63), a requirement of all claims as amended.

The Harvey Declaration also attempted to corroborate an earlier date of conception with attached documents, but like the '988 application, those documents did not disclose the subject matter claimed in the '629 patent. Several

of the attached documents, including a financial spreadsheet, driving directions to the offices of "Skycache," ideas about marketing and partnering, and sparse and virtually illegible handwritten notes, contain no technology discussion whatsoever, let alone discussion of a technology that includes the claim elements. (JA3109-3112, JA3132-3133, JA3143-3153.)

Only four of the documents attached to the Harvey Declaration contain anything approaching a technology discussion, but those documents are insufficient to support an early date of conception. (JA3113-JA3131, JA3134-3142.) All four of those documents are undated and no evidence was presented to corroborate the inventor's assertion as to when they were actually prepared. Moreover, they do not show each feature or limitation of the claimed invention as required for conception. *See Slip Track Sys., Inc.*, 304 F.3d at 1263. These documents do not mention, or even suggest, the steps of community creation required by every claim of the '629 patent.

This is illustrated by the "Technology Brief" in Exhibit C, the document Mr. Harvey relied upon most heavily in his declaration. (JA3101-3104, ¶¶ 4-7(h)(i-p).) The document does not disclose the claimed invention of user-created on-line communities. It instead describes a pre-built "lobby" executable file that is "distributed via mass e-mailings to highly targeted groups of customers," which those customers can forward to other users. (JA3114 (Exhibit C) (under

"Description").) It describes nothing more than a game and application distribution system. It does not describe a process for creating a community, let alone the specific steps required by every claim including receiving from a user "community identification information" or "a selection of at least one application object," or "creating a community based on the community identification information and the at least one application object."[7]

The Harvey Declaration relies on a strained reading of two tersely-worded steps near the end Exhibit C (Steps 17-18), but they plainly do not disclose community creation or the steps required by the claims of the '629 patent. (JA3102, ¶ 7(j); JA3116 (Exhibit C) ("17. GGG [Global Game Gallery] offers to send itself to user's friends who enjoy the game   18. User sends GGG to 12 of his friends – repeat cycle.").)   These steps merely describe the process disclosed earlier in the document in which a user forwards a pre-built executable file to other users.   (*Id.* at 1 ("All recipients of the lobby will have permission (and be encouraged) to redistribute the executable to all of their friends.").)   There is no suggestion that the "lobby" executable is user-customizable in any way.  Receiving a pre-built executable program and forwarding the identical file to other users is

---

[7]   The "Technology Brief" even includes a handwritten section entitled "Possible 'Inventions" that does not mention community creation.    The potential "inventions" were: a "Lobby Executable," "Virtual Toy Technology," "Protection against dangerous viruses" and "Tickets/on-line purchase system."  (JA3116.)

not creation and transmission of a customized community based on user-specified "community identification information" or selected "application objects," as recited in every claim of the '629 patent.

Mr. Harvey's declaration also cites to Exhibit E, an undated series of drawings that likewise do not address any of the steps of community creation recited in the claims. Mr. Harvey concedes that work on those charts took place from "February 1998 through September 3, 1998" (JA3101, ¶ 7(g)), and there is no explanation as to when material was first introduced into the drawings. The same is true with respect to the other two "Technology Briefs" (Ex. D and G), which are likewise undated and do not disclose any of the claimed subject matter. Neither of these documents contains any disclosures relating to community creation. Even Mr. Harvey's declaration, which is replete with uncorroborated and unsubstantiated embellishments of these documents, does not attempt to connect them to the elements recited in each claim. (JA3102, ¶ 7(j) (purported discussion of claims 1, 9, 17 and 25).)

Finally, the patent owner does not make any claim of prior invention with respect to any of the following claims: claims 5-8, 13-16, 21-24, 29-32, 77, 81, 84, 86, 88, 90, 93, 95, 98, 100, 102, 106, 108, 112, 115, 117, 119, 121, 124, 126, 131 and 137-145. (JA3099 (¶ 7), JA3104 (¶ 8), JA3107 (¶ 9).) Because the Rule 131

Declaration does not even address these 46 claims, they are indisputably not entitled to any early date of invention.

### 5. Substantial Evidence Supported the Board's Rejection of the Patent Owner's Reduction to Practice Arguments

The patent owner's claim of early invention also fails for the independent lack of diligence in reduction to practice. The patent owner does not claim any *actual* reduction to practice, but rather, *constructive* reduction to practice based on the filing of the '988 application on September 15, 1998. As explained in the previous section, however, constructive reduction to practice could not have occurred on September 15, 1998 because the claimed subject matter was not disclosed in the earlier '988 application. For this reason alone, XACP's claim of prior invention fails.

But even if September 15, 1998 was a valid date for constructive reduction to practice, substantial evidence supported the Board's decision. The Harvey Declaration affirmatively negated any claim of diligence by acknowledging that the inventors voluntarily delayed development of "Envelopment," the product that is claimed to embody the claimed system, in favor of another product known as "Sanctum." The declaration states that, between May and September 1998, the company was "investing substantial time and effort" in Sanctum (JA3104-05, ¶¶ 8(a)-(d)), which was diverting time and resources away from Envelopment.

31

The Harvey Declaration attempts to excuse this decision by alluding to a "lack of funds" during this period, but in truth, the inventors simply made a voluntary decision to devote their resources and funds to Sanctum and not Envelopment. Mr. Harvey admits, for example, that he introduced Sanctum at a trade show in May 1998 and "traveled the country" promoting that product (JA3104-05, ¶¶ 8(a)-(c)), which unquestionably consumed funds and resources that could have been used for Envelopment. The fact that the inventors chose to place Envelopment on the back-burner is fatal to their claim of diligence in reduction to practice. *See Scharmann v. Kassel*, 179 F.2d 991, 997 (C.C.P.A. 1950) (fact that inventor was "engrossed in the pursuit of other projects" demonstrated lack of diligence).

A second and related problem is that the Harvey Declaration reveals long periods of unexplained delay. An inventor who submits a declaration of prior invention must show continuous diligence in reducing the invention to practice. *See* 37 C.F.R. § 1.131(b). It is not enough to simply declare that the inventor was diligent; the patent owner "must account for the entire period during which diligence is required." M.P.E.P. § 2138.06. The Harvey Declaration reveals that very little occurred during the period from May 22, 1998 until September 1998. The only activity identified by the patent owner during this period that relates to the development of Envelopment consists of: (1) preparation of a three page

"Technical Brief" in May 1998 (JA3101, ¶ 7(f)), (2) unidentified "development and implementation" work by co-inventor Robert Deckelbaum and a consultant in July 1998 (JA3105, ¶ 8(d)), (3) the preparation of another "Technical Brief" in July 1998 (JA3105-06, ¶ 8(e)), and (4) engaging a law firm to prepare a patent application in September 1998 (JA3107, ¶ 8(i)).  The declaration does not explain or account for the many gaps in this timeline.  The entire month of August 1998, for example, appears to have been consumed by a business meeting with Hasbro and general fund-raising efforts.  (JA3106, ¶¶ 8(f)-(h).)  The Federal Circuit has found much shorter periods of inactivity fatal to a claim of prior invention.  *See In re Mulder*, 716 F.2d 1542, 1545 (Fed. Cir. 1983) (two day period lacking activity fatal to declaration); *Fitzgerald v. Arbib*, 268 F.2d 763, 766 (C.C.P.A. 1959) (less than one month of inactivity fatal to declaration).

The start-and-stop manner in which the inventors approached Envelopment cannot support a claim of diligence.  XACP may not agree with the Board's conclusion that its priority date arguments were without merit, even if considered, but it has not come close to showing the lack of substantial evidence to support it.

## B.    Substantial Evidence Supported the Board's Obviousness Rejections

Obviousness presents a question of law based on underlying facts.  *See Soverain Software LLC*, 705 F.3d at 1336.  This Court reviews the Board's determination of obviousness *de novo* (as it is a question of law), and reviews the

33

Board's factual findings for substantial evidence. *See Applied Materials, Inc.*, 692 F.3d at 1294.

XACP challenges the three obviousness rejections entered by the Board, which cover all pending claims: (1) claims 1-32 and 76-146 are obvious over Hill (Yahoo!) in view of Tatham and Liu; (2) claims 1-32 and 76-146 are obvious over Miller in view of Liu; and (3) claims 1-32 and 76-146 are obvious over Tatham in view of Herz and Liu. XACP's challenges focus exclusively on the independent claims, and in particular, a single requirement recited in those claims.

XACP refers to this requirement as the "Transmitting/Transmission Limitations." (App. Br. at 12.) These limitations, which were the subject of amendments by XACP following the first decision by the Board, generally require that a community be "transmitted" to at least one communications address after its creation. This requirement is reflected in the final limitation in claim 1:

> 1. (Amended) A method for creating a community for users with common interests to interact in, the method comprising the steps of:
>
> * * *
>
> receiving a selection of at least one application object from the registered user, <u>said at least one application object including an executable component</u>;
>
> * * *
>
> *transmitting the created community, <u>including the at least one application object</u>, based in part on the at least one communications address*.

(JA2775 (underlining in original, showing amendments made during reexamination; italics added).)

As shown above, claim 1 was amended after the initial Board decision to require that the "at least one application object" include "an executable component." The final "transmitting" limitation (shown in italics) was amended to require that the transmission of "the created community" also include "the at least one application object." Similar limitations were added to the other independent claims, although using slightly different language. (*See* JA2777-78 (amended claim 9), JA2780 (amended claim 17), JA2782-83 (amended claim 25), JA2785-86 (new claim 76), JA2791-92 (new claim 107).) XACP does not contend that any of the "Transmitting/Transmission" limitations should be treated differently with respect to any other independent claim. And these are the only claim limitations upon which XACP relies in its attempt to challenge the obviousness rejections affirmed by the Board. (App. Br. at 12-14.)

The problem with XACP's position, as explained in more detail below, is that the amended "transmitting" limitations placed its claims directly into the path of obviousness. The "application object" functionality, including the "transmission" of a community including an application object, added nothing novel or non-obvious to the on-line community system recited in the original claims. This is because, as the specification acknowledged, these "application

objects" could be implemented using well-known Internet web browser and "Java" technologies.  (JA44, 1:45-46 ("Additionally, it is possible to download code, such as Java code, through a user's browser application."); JA56, 25:14-16 ("[T]he user can launch a game in a community by initiating an application object, e.g. a JAVA application object ….").  XACP's claim amendments, therefore, did nothing more than attempt to add existing Java technology to the community creation systems described in the prior art.

In particular, as shown in more detail below, the Hill, Tatham, and Miller prior art references disclose a web-based system in which a "community" is created and then transmitted in the form of a web page to another user.  The Board's obviousness combinations were all based on a straightforward premise – that it would have been obvious to enhance these web-based online communities to add the "Java" capability acknowledged in the specification as prior art.

To further explain this "Java" technology, Facebook identified U.S. Patent No. 6,058,482 entitled "Apparatus, Method and System for Providing Network Security for Executable Code in Computer and Communications Networks" to James C. Liu ("Liu") and assigned to Sun Microsystems, Inc., the original creator of Java.  (JA3454.)  Liu explains that "Java" provides a technique for transmitting executable application objects, known as Java "applets," over the Internet through a web connection.  (JA3460, 2:8-18.)  Liu was cited in the obviousness rejections

to confirm that transmitting an "application object" or "executable component," as required by the claims, did not present a patentable distinction over the prior art. The only portions cited came from the "Background" section of Liu, which described Java as prior art even to the invention of Liu:

> When a network user accesses and requests information from a web page using a Java-enabled browser, an executable application or program package referred to as an "applet" or "applet package" may be downloaded in bytecode form to the user end system (the client side of the client-server network). The applet (in bytecode form) is then executed by the JVM of the web browser which, coupled with any data downloaded from the network, provides a locally running application on the user end system. Such locally running applications may include an interactive web page, an interactive game application, or an interactive spreadsheet.

(JA3460, 2:8-18.)  It is hard to imagine a more straightforward combination than adding existing "Java" capability to the web page communities in Hill, Tatham and Miller, particularly considering that a key purpose of Java technology is to transmit an executable application to a web browser to provide "a locally running application on the user end system." (*Id.*, 2:15-16)

The Federal Circuit has repeatedly affirmed the invalidation of patent claims, such as the ones presented here, where a patentee attempted to distinguish the prior art through claim limitations that simply incorporated well-known web or Internet features.  *See Soverain Software LLC*, 705 F.3d at 1340-41 (holding that claim limitations directed to well-known Internet features did not render claims

non-obvious); *W. Union Co.*, 626 F.3d at 1370 ("Based on the Supreme Court's reasoning in *KSR*, we have subsequently held that applying computer and internet technology to replace older electronics has been commonplace in recent years."); *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1351-52 (Fed. Cir. 2010); *Muniauction, Inc.*, 532 F.3d at 1324 (internet and web browser usage did not render claims nonobvious). The pending claims are obvious for the same reasons articulated in those decisions.

The very documents that the patent owner belatedly submitted to the Board to support an earlier date of conception acknowledged that the Envelopment product under development could use "known and accepted Internet protocols (IRC, http and the email protocol) to set up games <u>which are JAVA applications of the sort generally found on game web sites</u> (like Yahoo games)." (JA3114 (under "Description") (underlining added).) As explained below, for each of the obviousness rejections adopted by the Board, adding Java capabilities to a web page presented no non-obvious distinction over the prior art.

### 1.     The Board Provided More than Sufficient Reasoning to Combine Each of the References.

XACP claims that Board did not articulate a "rational underpinning" to combine the cited references for the three obviousness rejections entered by the Board. (App. Br. at 28-38.) The passages of the Board decision block-quotes in

XACP's opening brief, however, demonstrate that the Board provided more than sufficient reasoning to support its analysis. (JA18-20.)

The gravamen of XACP's argument appears to be that the Board should have issued a lengthy decision with extensive findings to support its obviousness combinations. But the law imposes no such requirement. This Court has held that a Board decision, even if cursory and "of less than ideal clarity," will be upheld "if the agency's path may reasonably be discerned." *Applied Materials, Inc.*, 692 F.3d at 1294 (quotations and citation omitted). The court in *Applied Materials* affirmed a Board's finding of obviousness based on reasoning far less detailed than the reasoning articulated by the Board in the present case, notwithstanding that *Applied Materials* involved substantially more complex technology. *Id.* at 1294-95. Here, the conciseness of the Board's decision is simply a by-product of (a) the fact that this case involves straightforward combinations of well-known Internet technologies, (b) the ample evidence in the record to support those combinations, and (c) the lack of any contrary evidence submitted by XACP.

The rationale articulated by the Board was similar to that adopted by this Court in *Muniauction, Inc.*, 532 F.3d 1318, which found that a patent claim was obvious where the difference between the prior art and the claimed invention was use of conventional web browser technology. *Id.* at 1325-26. The key inquiry in that case, as here, was "whether the improvement is more than the predictable use

of prior art elements according to their established functions." *Id.* at 1325 (quotations and citation omitted). In the present case, the Board specifically found that Liu and Hill disclose sending of applications to the end user's computer, and that this was no different from the asserted "transmitting" feature. (JA18-19.) The Board relied in part on the "predictable results" rationale of *KSR*, the same rationale relied upon by this Court in *Muniauction*, to find that adding this feature presented no non-obvious distinction over the systems of Tatham and Miller. (JA18-20.) The Board also expressly incorporated the reasoning provided by the third party requester, which cited additional evidence and rationale. (JA19 (citing JA3260-63.) As explained below, each of the Board's rejections was supported by substantial evidence.

### C. The Board's Rejection Based on Hill (Yahoo!) and Tatham Was Supported by Substantial Evidence.

Brad Hill, *Yahoo! for Dummies* (1999) ("Hill (Yahoo!)") (JA2887) and U.S. Patent No. 6,223,177 B1 to Charles Tatham ("Tatham") (JA3468) both disclose similar web-based systems for creating on-line interactive communities. Hill (Yahoo!) discloses a system known as "Yahoo! Clubs" that provides an online community that users can access using their web browsers, and communicate using tools such as Chat, Photos and Events. (JA2926, JA2927 (Fig. 14-1), JA2932-2940.) An exemplary Yahoo! Club home page is shown in Figure 14-1:



**Figure 14-1:** The home page of a Yahoo! club. Each club looks pretty much the same and is easy to set up.

(JA2927.)

Figure 14-1 of Hill above shows a web page view of an exemplary Yahoo! Club entitled "Fitness and Health Club," showing related content and links on the left side for functions such as "Messages," "Photos," and "Chat." (*Id.*) Tatham discloses a similar on-line community system that allows users to create web-based online communities that include applications selected by the user such as chat, bulletin board, and other features. (JA3479-80, 4:55-5:9; JA3480, 6:9-29.) XACP does not contend that the Board erred in finding that Hill and Tatham could be

combined with each other – its challenge is limited to the combination of these references with Liu.[8]

The combination of Hill, Tatham and Liu presented a compelling obviousness combination for claims 1-32 and 76-146, and the Board's reasoning was supported by substantial evidence. As noted previously, the only feature XACP contends is missing by the combination is the "Transmitting/Transmission Limitations." But those limitations were fully disclosed in Hill <u>and</u> Liu.

Hill explains that one of the features of an online community (or "Club") was a web-based "Chat" feature, a link to which is shown in Figure 14-1 above. Hill explains that the Chat feature is available in two flavors – a basic HTML web page or an executable Java application. Hill provided an express motivation to use the Java-based application by stating that, for most versions, the Java version was superior. (JA2908 (top of page), JA2912.) "Under normal conditions with a fairly modern computer," Hill explains, "most people should probably choose Java chatting. Java is easier, smoother and has more features." (JA2912 (bottom of page, left column); *see also* JA2914-15 (explaining how to "go upscale" with Java

---

[8]    Tatham was cited in this obviousness combination for the claim limitations requiring the receipt of a selection of an application object for inclusion in the community. (JA3003-05.) The first decision by the Board specifically rejected XACP's arguments that Hill and Tatham could not be combined for this purpose. (JA2638-39; *see also* JA591-JA624 (claim chart explaining mapping of Hill and Tatham).) XACP does not challenge this finding here, or make any arguments about claim limitations relating to the selection of application objects. As explained in the text, its challenge is limited to the "transmitting" limitations.

Chat).)  Hill further explained how a user could activate the Java Chat feature by clicking a link on a Yahoo! Club home page, resulting in performance of the "transmitting" limitation.

> When you click the <u>Chat</u> link on the home page, your browser downloads the Java chat program (it doesn't take long).  After it's in place, you can see who else is in the room and begin chatting (see Figure 14-8).

(JA2937 (underlining in original).)

Hill further explains that Java "delivers applications to your computer by means of very quick downloads – usually  just a minute or two, if that." (JA2948.) In sum, Hill not only discloses the use of Java for on-line communities, but explains why it is preferable to standard HTML and explains how Java delivers executable applications over the Internet for use with an online community. (*See* JA2912, JA2914-15, JA2948.)  The Board had more than substantial evidence to conclude, as it did, that the "Transmitting/Transmission Limitations" presented no non-obvious distinction over the prior art. (JA19.)

XACP inaccurately argues that the portions of Hill discussed above "teach no more than delivering applications to a computer." (App. Br. at 41.)  Hill discloses far more than merely delivering applications to a computer.  It specifically discloses delivering a Java "Chat" application, which is part of the created online community (Club), to other members of the community.  (JA2937.)

XACP provides no coherent explanation as to why Hill does not fully disclose the transmitting elements recited in the claims.

XACP also contends that the Board did not articulate a rationale for combining Hill and Tatham with Liu (App. Br. at 32-33) but this argument is unavailing because the Board did not need to rely on Liu for the "transmitting" limitation for this combination. The Board found that Hill alone discloses the "transmitting" limitation. (JA19 (citing JA3260-63).) The Liu reference, although not necessary to this obviousness combination, nonetheless supported the Board's decision because it confirmed that Java can provide "a locally running application on the user end system," which can be used to provide "an interactive web page," "an interactive game application," or other applications. (JA3460, 2:15-18.) XACP has identified no error in the Board's reasoning.

XACP devotes a significant portion of its brief to the irrelevant argument that the Board misinterpreted the claim term "community" in its first decision when evaluating a different prior art reference. (App. Br. 43-46.) XACP does not explain how this issue is material to this obviousness combination, particularly considering that XACP does not appear to contend that Hill actually lacks a "community," even under XACP's definition. XACP instead merely asserts, without explanation, that the rejection should be reversed based on this allegedly erroneous and inapplicable construction. (*Id.* at 46.)

But a more accurate reading of the record makes clear that XACP's quibbles with the Board's early discussion of "community" are entirely irrelevant.  XACP attacks a portion of the Board's *first* decision rejecting XACP's argument that the Roseman reference did not disclose the claimed "community."  (JA2640-41.) XACP neglects to mention, however, that the Board in the very next paragraph of that initial decision found a "community" in Roseman even under XACP's construction, rendering the issue moot.  (JA2641 ("In addition, even assuming a 'community' is 'information and at least one function' that is accessed via a network as Cross-Appellant asserts, we find no difference between such a 'community' as defined by Cross-Appellant and Roseman's group of individuals participating in a virtual conference…").)

This portion of the Board's initial decision has no relevance to the obviousness rejections adopted in the second decision because the Board had no occasion to revisit the definition of "community."  This is because after XACP amended its claims following the first Board decision, it turned its focus entirely to the amended "transmitting" limitation, and did not argue that Hill lacked a "community" – even under XACP's definition.  (JA3204-05.)  The Board therefore had no reason to address the definition of "community," nor does this Court have any reason to address it as it is not pertinent to any disputed issue.  *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362-63 (Fed. Cir. 2008)

(recognizing that courts "are not (and should not be) required to construe every limitation present in a patent's asserted claims" but only "[w]hen the parties present a fundamental dispute regarding the scope of a claim term").

In any event, any suggestion that Hill does not disclose a "community" under XACP's definition (*i.e.* "information and at least one function that may be accessed through a communication network") would be meritless. Hill discloses an on-line community that includes information (e.g., the Club content as appearing on the Club page), and at least one function that may be accessed through a communication network (e.g., the Chat function provided through a Java executable transmitted to the user's computer). (*See* JA2927 (Fig. 14-1 (showing Yahoo! Club home page, content and "Chat" link), JA2937 (explaining how to download and execute Java chat application by clicking link from the Yahoo! Club home page).)

XACP has identified no error in the Board's rejection based on Hill, Tatham, and Liu. Because this rejection covers all pending claims, an affirmance of this rejection makes it unnecessary to consider any of the other rejections challenged by XACP in the present appeal.

### 1. The Board's Rejection Based on Miller and Liu Was Supported by Substantial Evidence.

The Board also properly rejected all pending claims as obvious over U.S. Patent Application Pub. No. 2005/0055306 entitled "User-Defined Dynamic

Collaborative Environments" to Craig Miller et al. ("Miller") (JA3517) in view of Liu (JA3454).  Miller discloses a system for allowing a user to define, select tools for, and create a web-based online community, referred to in Miller as a "dynamic collaborative environment" or "group."  (JA3550 (¶ 0015), JA3562 (¶ 0264).) These environments are accessible to multiple users or "members" through computer networks, including the Internet.  (*See id.*.)  Miller explains that a user can select at least one application object (e.g., communications tool) for inclusion in the community.  (*See, e.g.*, JA3565 (¶ 0295).)

The methods and systems disclosed in Miller are strikingly similar to those recited in claims 1-32 and 76-146 as demonstrated by the detailed claim chart the Requester provided to support this proposed rejection.  (JA2988-JA3003.)  XACP, in fact, does not dispute that Miller discloses every element of all pending claims except for one aspect of the "transmitting" limitations.  (App. Br. at 48-49.)

Miller discloses "transmitting" the community in the sense that it transmits a web page that makes the community and the selected applications available to the user.  (JA3550 (¶ 0043) ("**FIG. 20B** shows a web page generated for a specific user-defined environment, including tools available to group members having access to the environment."); *see also* JA2991-92 (citing additional portions of Miller).)  The only feature not expressly disclosed by Miller is the transmission of an "application object" that includes "an executable component."

47

The Java applet technology disclosed in Liu, however, discloses that feature. Liu explains that a Java applet may be downloaded to the user's web browser for execution by the browser "which, coupled with any data downloaded from the network, provides a locally running application on the user end system." (JA3460, 2:7-16.) "Such locally running applications may include an interactive web page, an interactive game application, or an interactive spreadsheet." (*Id.*, 2:16-18.) Miller similarly discloses the ability of a community to include web-accessible tools "such as word processing and spreadsheet[]" programs. (JA3565 (¶ 0296).)

It is difficult to imagine a more appropriate combination under *KSR* than to take a web site that provides functionality through a basic web page – such as the community web page in Miller – and enhance it with the widely-known Java applet capability from Liu. A community in Miller that provides a spreadsheet or other program through a basic HTML web page, therefore, could be readily adapted to use known Java applet technologies in Liu, predictably resulting in a system that transmits a community to a user by transmitting an "application object" that includes an "executable component." The Board had ample basis to conclude, as it did, that it would have been obvious to combine Miller and Liu. (JA19.)

XACP argues that the combination of Miller and Liu is insufficient because, according to XACP, Liu teaches only downloading an applet to an end user system and not the transmission of the "community" as recited in the claim. (App. Br. at

48-49.) This argument misunderstands the purpose for which Liu was cited. Liu was not cited for the transmission of the "community" of the claims – that was supplied by Miller, which discloses transmitting a web page to the end user that provides interactive capabilities and the ability to interact with communication tools. (JA3550 (¶ 0043); JA3562 (¶ 0264); JA3565 (¶ 0296), JA3577-78 (¶ 0744).) Liu was cited for the narrow additional requirement of transmitting an "application object" with the community that includes an "executable component." Liu indisputably discloses this additional feature, and thus, the combination of Miller and Liu discloses all limitations of the claims.

### 2.    The Board's Rejection Based on Tatham, Herz and Liu Was Supported by Substantial Evidence.

Substantial evidence also supported the Board's rejection of all claims as obvious over Tatham in view of U.S. Patent No. 6,029,195 to Frederick Herz (JA3391) and Liu. During the reexamination, Facebook provided claim charts explaining the basis of the rejection and why the combination was appropriate. (JA3014-25; JA508-54.) The Herz reference is not pertinent to this appeal because it was relied upon only for dependent claims that are not specifically addressed in XACP's brief.

XACP's arguments regarding this rejection are similar to its arguments regarding the combination of Miller and Liu discussed above. As with Miller, the

only limitation XACP argues is missing from the prior art in this combination is "transmitting" or "transmission" of a community. (App. Br. at 34-35.)

Tatham discloses "transmitting" the community in the sense that it transmits a web page that makes the community and selected applications available to the user (JA3479-80, 4:43-5:1), but Tatham does not expressly disclose the transmission of at least one "application object" with "an executable component" to the user. This aspect of the transmission limitation, however, is supplied by the Java applet technology disclosed in Liu. (JA3460, 2:8-18.) As explained previously, Liu discloses that a Java applet may be downloaded in bytecode form to the user end system and may provide an interactive web page, an interactive game application, or an interactive spreadsheet. (*Id.*)

The Board correctly found that the combination of Tatham and Lui "would have resulted in no more than the predictable result of a computer system in which applications may be downloaded (or 'transmitted') to end users." (JA20.) The Board recognized that it would be obvious to take an existing system that provides application functionality through a basic web page – such as the workgroup website in Tatham – and enhance it with the widely-known Java applet capability from Liu. Liu also provides an express teaching, suggestion or motivation to combine in stating that the Java application objects can be used to provide "an

interactive web page" (JA3460, 2:16-17), precisely the type of use contemplated by Tatham. (JA3479, 3:39-49; JA3480, 6:8-28.)

Echoing substantially the same argument it made for Miller above, XACP argues that the combination of Tatham and Liu is insufficient because Liu "teaches no more than downloading an applet to an end user system," and does not disclose the transmission of a community. (App. Br. at 47-48.) But as explained previously, this argument misunderstands the purpose for which Liu was cited. Liu was not cited for the transmission of the broader "community" of the claims. Tatham itself discloses transmitting a web page to the end user that provides interactive capabilities and the ability to interact with communication tools. (JA3480, 6:8-28.) Liu was cited for the narrow limitation arguably missing from Tatham – the additional transmission of an "application object" including an "executable component." This is indisputably disclosed by Liu, and thus, the combination of Tatham and Liu discloses all limitations of the claims.

## VI. SUBSTANTIAL EVIDENCE SUPPORTED THE BOARD'S REJECTIONS BASED ON ROSEMAN AND SARIN

XACP also challenges the Board's finding that (1) claims 1-32 are anticipated by Roseman, that (2) claims 1, 2, 4-7, 9, 10, 12-15, 17, 18, 20-23, 25, 26, and 28-31 are anticipated by Sarin, and that (3) claims 3, 11, 19 and 27 are obvious over Sarin in view of Hill. (App. Br. at 49-63.) Anticipation is a question of fact, and the Board's factual findings with respect to anticipation are reviewed

for substantial evidence.  *See Gleave*, 560 F.3d at 1335.  As shown below, the Board's rejections based on Roseman and Sarin were supported by substantial evidence.

### A.    The Board's Anticipation Rejection Based on Roseman Was Supported by Substantial Evidence.

XACP's challenges narrowly focus on the requirement of "an application object" that is transmitted with the created community.  (App. Br. at 49-56.) XACP's arguments reflect nothing more than its disagreements with the Board's factual findings regarding the disclosures in Roseman.  XACP has in no way shown that the Board's decision lacked substantial evidence.

Roseman discloses a community building system that allows users to interact and collaborate with one another through communities known as virtual "conferences."  (JA3484.)  As explained in the Background section of the '636 patent: "The invention allows multiple persons, at different locations, to hold a conference, by providing many of the conveniences which the participants would have if present together in the same physical room."  (JA3508, 1:19-23.)  A user in Roseman creates a virtual conference room by clicking an appropriate icon, then identifying the name of the virtual conference room as well as the collaboration tools for use in the conference.  (JA3509, 3:22-24; JA3512. 9:61-10:12.)  A user who has created a conference may invite other users to join it through several means.  One way is to create an "invitation card" and transmit it to an invitee.

52

(JA3509, 4:5-27.)  "The invitation card is an active icon, which provides access for issuing commands to the host.  For example, when the Invitee clicks the pointing device onto the icon, the local computer presents a screen which displays information about the conference, such as date, time, so forth, as shown in FIG. 3."  (JA3510, 5:58-63.)

The Board properly found that Roseman's transmission of an "invitation card" to the invitee transmits an application object or executable component as recited in the claims.  As the Board explained in its first decision, the host in Roseman "'transmits' an application or executable component (i.e., an electronic 'invitation card' that issues commands to the host is left with an Invitee by the host)."  (JA2640.)  The Board's second decision further explained that the one of ordinary skill in the art would understand that the "invitation card," as described in Roseman, is an executable component because it contains code with ability to issue commands to the host (user) computer.  (JA14.)  XACP contends that Roseman does not disclose the transmission of an "application object" because, according to XACP, the "invitation card" is merely an image or user interface and not "an executable component."

The Board's findings were consistent with the disclosures of Roseman. Roseman explains that "[t]he invitation card is an *active icon*, which provides access for issuing commands to the host.  For example, when the Invitee clicks the

pointing device onto the icon, the local computer presents a screen which displays information about the conference, such as date, time, and so forth, as shown in Fig. 3." (JA3510, 5:58-63 (emphasis added).) This active invitation icon qualifies as an "application object" that includes an "executable component" because the icon causes the host computer to perform certain operations when the icon is executed.

For instance, Roseman discloses that "[t]he invitation card icon provides access to other options" (*id.*, 6:5-6), such as allowing an absentee member of the community to appoint a delegate (*id.*, 6:25-30), and allowing the delegate to notify others where it will be attending the conference (*id.*, 6:41-47). Roseman discloses that "[t]he Absentee performs the notification by <u>clicking on the invitation card, which causes the host to provide a menu of options to the Absentee</u>. The Absentee instructs the host to substitute the Delegate for the Absentee." (*Id.*, 6:44-47 (emphasis added).) The ability of the invitation card to invite a delegate to the virtual conference is, in fact, functionally equivalent to the "invitation application object" disclosed and claimed in the '629 patent. (*See* JA48 ('629 patent), 9:33-35 ("An invitation application object may allow a user to invite others, such as in the manner set forth in FIG. 3."); JA59, claim 4 ("The method according to claim **1**, wherein the selected at least one application object comprises at least one of: . . . (e) an invitation application object . . . .").)

Roseman also states that the invitation card includes electronic "keys" that permit access to virtual conference rooms. "Invitations and keys are distributed electronically. The key is an electronic object attached to the invitation." (JA3512, 9:54-55.) Roseman further discloses that by clicking on the active invitation icon, the user can pass the electronic key object to the delegate. (JA3511, 7:7-12.) "That is, as shown in Fig. 3, <u>one of the options of the invitation icon is to pass the key to a Delegate</u>. The host transfers the key, and any necessary information, to the Delegate." (*Id.*, 7:9-12 (emphasis added).)

The invitation card in Roseman would not be capable of performing the many functions described above – including causing the host to provide a menu of options, selecting a delegate or causing a key transfer – if it was simply a passive icon with no executable component. The Board therefore correctly found that the host in Roseman "'transmits' an application or executable component (i.e., an electronic 'invitation card' that issues commands to the host is left with an Invitee by the host)." (JA2640.)

The patent owner argues that the active invitation icon does not contain an executable component because it merely causes *the host computer* to perform certain functions. (App. Br. at 53.) This argument is based on flawed logic and unsupported assumptions. As in any computer system, the system in Roseman provides executable components for ***both*** a server/host computer ***and*** a client/user

computer. As the Board correctly found, the invitation icon in Roseman contains an executable component which causes further commands to be sent to the host. (JA3510, 5:58-59.) The fact that the host may have its own executable component that responds to commands from the invitation card does not change the fact that the invitation card also includes an executable component.

Anyone who has used Microsoft Windows (the preferred operating system in Roseman (JA3513, 12:1-9)) knows that icons can be used to represent executable application programs – a fact acknowledged in Roseman. (JA3511, 8:7-9 ("The private work area outside the window displays the icons representing the user's programs and data files.") (emphasis added).) XACP's assertion that that these icons are different from the active invitation icon misses the point – the fact that the invitation icon is "an icon" does not necessarily mean that it is merely a user interface with no executable component, as XACP argues. Substantial evidence supported the Board's conclusion that invitation icon in Roseman has the claimed executable component.

Nor is there any merit to the patent owner's contention that the active invitation icon in Roseman is merely a passive "user interface" or a "message component" that does not provide any functionality. (App. Br. at 53-54.) The patent owner relies on nothing but speculation and quotations from the specification of the '629 patent (not Roseman), apparently in an attempt to

compare the specification of the '629 patent with the specification of Roseman. (App. Br. at 53-55.) The fact that the specification of Roseman and the '629 patent use different language to describe the same thing is merely a difference in terminology, not substance, a reflection of the fact that Roseman pre-dates the '629 patent by almost eight years and emanated from a different company.

XACP has presented nothing more than a disagreement with the Board's factual findings, and has not shown that the Board's findings lacked substantial evidence.  XACP has failed to articulate any basis for this Court to upset the Board's rejection based on Roseman.

## B.    The Board's Anticipation Rejection Based on Sarin Was Supported by Substantial Evidence.

XACP's challenges against the Sarin rejection are based on substantially the same arguments as Roseman.  (App. Br. at 57-62.)  XACP has in no way shown that the Board's rejections involving Sarin lacked substantial evidence.

The 1984 Sarin reference, entitled "Software for Interactive On-Line Conferences" (JA495), describes the software architecture and implementation of a system for creating on-line virtual conferences.  Sarin explains that the purpose of a real-time conference is the sharing of "one or more *objects* (e.g., documents, circuits, agendas, proposals, or screen images) among a group of participants, allowing manipulation of these objects in a controlled way via one or more groups of commands called *activities*."  (JA496 (right column; italics in original).)

As the Board correctly found, Sarin discloses application objects that are given to participants when they join a conference. (JA15.) Sarin specifically states: "When the application-server receives an upcall indicating that the participant has joined, it then determines which shared objects the participant should receive (using its own access control criteria), and proceeds to 'give' these objects to the participant . . . ." (JA499 (right column).) These "objects" and "activities," as the Board found, include a series of "downcalls" that execute an activity on the host computer. (JA15 (citing JA499).)

One of the shared application objects transmitted to participants, known as a conference description object, contains executable instructions for setting up the conference. "Every conference has a distinguished object, called its *description*, that is always shared among all of its participants." (JA499 (left column) (italics in original).) A purpose of the conference description object is "[t]o <u>instruct</u> the participants' application-FEs [front-end devices] to supply information that will be used by the application-server in setting up some of the objects in the conference." (*Id.* (left column, ¶ 2) (emphasis added).) The application-FE uses this information to issue downcalls to the application-server. For example, if a user chooses to join a conference, "[t]he participant's application-FE <u>issues a Join-Conference downcall</u>, 'accepting' the conference description." (JA499 (right column) (emphasis added).) The Join-Conference downcall procedure includes description

and timestamp arguments that are sent to the application-server. (JA506 (left column).) Sarin discloses several other downcalls that the application-FE can issue, including "Create-Conference," "Leave-Conference," "Accept-Object," "Decline-Object," and "Send-Input," each with its own arguments and some including return values. (JA506-07.) XACP provides no explanation as to how the application-FE could be capable of issuing these downcalls if it lacked an executable component for handling the arguments and transmitting the downcalls to the application-server.

XACP has again presented nothing more than a disagreement with the Board's factual findings, and has not shown that the Board's findings lacked substantial evidence.

### C. The Board's Obviousness Rejection Based on Sarin and Hill Was Supported by Substantial Evidence.

Claims 3, 11, 19 and 27 are dependent claims that required that the "communications address" of the independent claim take the form of "an e-mail address." This rejection is therefore based on a combination with Sarin and Hill, with Hill used to disclose e-mail addresses. XACP does not present any argument directed at these dependent claims beyond its assertion that the Board erred in rejecting independent claims 1, 9, 17 and 25 as anticipated by Sarin. (App. Br. at 63.) Because the anticipation rejection was supported by substantial evidence, XACP's arguments with respect to these claims likewise fail.

## VII.   CONCLUSION

For each of the foregoing reasons, Facebook respectfully requests that this Court affirm the Board's rejections of the '629 patent.

Dated: January 13, 2014                    Respectfully submitted,

COOLEY LLP


*/s/ Heidi L. Keefe*
Heidi L. Keefe
Cooley LLP

*Attorneys for Appellee*
*Facebook, Inc.*

# United States Court of Appeals
## for the Federal Circuit

*CROSS ATLANTIC CAPITAL PARTNERS, INC. v FACEBOOK, INC.*
2013-1596

## **CERTIFICATE OF SERVICE**

I, John C. Kruesi, Jr., being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by COOLEY LLP, Attorneys for Appellee to print this document. I am an employee of Counsel Press.

On **January 13, 2014**, Counsel for Appellee has electronically filed the foregoing **Appellee Brief** with the Clerk of Court using the CM/ECF Sytem, which will serve via email notice of such filing to any of the following counsel registered as CM/ECF users:

David B. Walker
Barcelo Harrison & Walker LLP
1629 K Street, N.W., Suite 300
Washington, D.C., 2006
Tel: (202) 567-6778
Fax: (949) 258-5752
dwalker@bhiplaw.com
*Counsel for Appellant*
*Cross Atlantic Capital Partners,*
*Inc.*

Frederick A. Teece
Panithc Schwarze Belisario &
    Nadel LLP
One Commerce Square
2005 Market Street, Suite 2200
Philadelphia, PA  19103
Tel: (215) 965-1330
Fax: (215) 965-1331
ftecce@panitchlaw.com
*Counsel for Appellant*
*Cross Atlantic Capital Partners,*
*Inc.*

James H. Wallace, Jr.
Gregory R. Lyons
Kevin P. Anderson
Wiley Rein LLP
1776 K Street, N.W.
Washington, D.C. 20006
Tel: (202) 719-7000
Fax: (202) 719-7049
glyons@wileyrein.com
jwallace@wileyrein.com
kanderson@wileyrein.com
*Counsel for Appellant*
*Cross Atlantic Capital Partners,*
*Inc.*

Paper copies will also be mailed to the above counsel at the time paper copies are sent to the Court.

Upon acceptance by the Court of the efiled document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

January 13, 2014                              /s/ John C. Kruesi, Jr.
                                              John C. Kruesi, Jr.
                                              Counsel Press

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 13,893 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using MS Word 2007 in a 14 point Times New Roman font.

January 13, 2014                          /s/ Heidi L. Keefe
                                          Heidi L. Keefe
                                          Cooley LLP

                                          *Attorneys for Appellee*
                                          *Facebook, Inc.*